IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| CITY OF SPRINGFIELD, OHIO, <u>et al.</u> | : | Case No. 3:25-cv-00033 |
| | : | |
| Plaintiffs, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Caroline H. Gentry |
| v. | : | |
| | : | **PLAINTIFFS' MEMORANDUM OF** |
| BLOOD TRIBE, <u>et al.</u> | : | **LAW IN OPPOSITION TO** |
| | : | **DEFENDANT POHLHAUS' MOTION** |
| Defendants. | : | **TO DISMISS** |

James Pasch (0086809)
ANTI-DEFAMATION LEAGUE
605 Third Avenue
New York, NY 10158-3650
Tel: 212-885-7700
jpasch@adl.org

Glen R. McMurry (0082600)
TAFT STETTINIUS & HOLLISTER, LLP
40 North Main Street, Suite 1700
Dayton, OH 45423-1029
Tel: 937-228-2838
Fax: 937-228-2816
gmcmurry@taftlaw.com

Daniel J. Kramer (*pro hac vice*)
Gregory F. Laufer (*pro hac vice*)
Marques S. Tracy (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: 212-373-3000
Fax: 212-757-3990
dkramer@paulweiss.com
glaufer@paulweiss.com
mtracy@paulweiss.com

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 2

LEGAL STANDARD ............................................................................................... 4

ARGUMENT ............................................................................................................. 5

    I.    COUNT I: CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42
         U.S.C. § 1985 ............................................................................................. 5

         A.    Existence of a Conspiracy ........................................................... 6

         B.    Purpose of the Conspiracy .......................................................... 9

         C.    Overt Acts and Injuries ............................................................. 12

         D.    The Intracorporate Conspiracy Doctrine Is Inapplicable .......... 12

    II.    COUNT II: FAILURE TO PREVENT INTERFERENCE WITH CIVIL
         RIGHTS UNDER 42 U.S.C. § 1986 .................................................... 13

    III.    COUNT III: COMMON LAW "ABSOLUTE" PUBLIC NUISANCE .............. 14

    IV.    COUNT IV: TELECOMMUNICATIONS HARASSMENT ............................ 15

    V.    COUNT V: MENACING ................................................................... 16

    VI.    COUNT VI: INCITEMENT TO VIOLENCE ...................................... 17

    VII.    COUNT VII: ETHNIC INTIMIDATION ........................................... 18

    VIII.    COUNT VIII: CIVIL CONSPIRACY ................................................ 19

    IX.    COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL
         DISTRESS ................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.W.* v. *Kircher*,
    244 N.E.3d 732 (Ohio Ct. App. 2024) ...................................................................15

*Abels* v. *Farmer Commodities Corp.*,
    259 F.3d 910 (8th Cir. 2001) .................................................................................9

*Alahverdian* v. *Nemelka*,
    2015 WL 5004886 (S.D.Ohio, 2015).....................................................................5

*Azar* v. *Conley*,
    466 F.2d 1386 (6th Cir. 1972) .............................................................................10

*Bazzi* v. *City of Dearborn*,
    658 F.3d 598 (6th Cir. 2011) .............................................................................6, 8

*Beck* v. *Stony Hollow Landfill, Inc.*,
    2017 WL 1551216 (S.D. Ohio May 1, 2017) .......................................................14

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 545 (2007).................................................................................................4

*Bergman* v. *United States*,
    551 F. Supp. 407 (W.D. Mich. 1982) .......................................................5, 13, 14

*State* v. *Bragg*,
    2019 WL 1503002 (Ohio Com. Pl. Mar. 19, 2019).............................................15

*Cameron* v. *Brock*,
    473 F.2d 608 (6th Cir. 1973) ...............................................................................10

*Cincinnati* v. *Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) ..............................................................................14

*CSX Transp., Inc.* v. *Stevenson*,
    2017 WL 1968384 (S.D. Ohio Mar. 15, 2017).............................................16, 17

*Franklin* v. *Rose*,
    765 F.2d 82 (6th Cir. 1985) ...................................................................................2

*Genaw* v. *Garage Equip. Supply Co*,
    856 F. App'x 23, 29 (6th Cir. 2021) ......................................................................9

*Griffin* v. *Breckenridge*,
    403 U.S. 88 (1971) ................................................................................................5, 10

*Harris* v. *Cunix*,
    187 N.E.3d 582 (Ohio Ct. App. 2022) ....................................................................15

*Hull* v. *Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*,
    926 F.2d 505 (6th Cir. 1991) ...................................................................................12

*In re Jackson Lockdown/MCO Cases*,
    568 F. Supp. 869 (E.D. Mich. 1983) .......................................................................13

*Jacobson* v. *Kaforey*,
    75 N.E.3d 203 (Ohio 2016) .....................................................................................15

*James* v. *Hampton*,
    592 F. App'x 449 (6th Cir. 2015) ..............................................................................5

*Johnson* v. *Hills & Dales Gen. Hosp.*,
    40 F.3d 837 (6th Cir. 1994) .....................................................................................13

*Johnson* v. *Univ. of Cincinnati*,
    215 F.3d 561 (6th Cir. 2000) .............................................................................10, 19

*Lane* v. *Brewster*,
    2012 WL 1029503 (Ohio Ct. App. Mar. 30, 2012) ................................................16

*Mangelluzzi* v. *Morley*,
    40 N.E.3d 588 (Ohio Ct. App. 2015) ......................................................................19

*Meyers* v. *Cincinnati Bd. of Educ.*,
    343 F. Supp. 3d 714 (S.D. Ohio 2018) ...................................................................20

*Meyers* v. *Hot Bagels Factory, Inc.*,
    721 N.E.2d 1068 (Ohio Ct. App. 1999) ..................................................................20

*In re Nat'l Prescription Opiate Litig.*,
    477 F. Supp. 3d 613 (N.D. Ohio 2020) ...................................................................14

*State* v. *Ozias*,
    2003 WL 22326565 (Ohio Ct. App. Oct. 13, 2003) ..............................................16

*Saunders* v. *Valverde*,
    2012 WL 2918516 (S.D. Ohio July 17, 2012) ..........................................................6

*Sealed Plaintiff 1* v. *Patriot Front*,
    2024 WL 1395477 (E.D. Va. Mar. 31, 2024) ....................................................10, 13

*Sines* v. *Kessler*,
    324 F. Supp. 3d 765 (W.D. Va. 2018) ........................................................................10, 14

*Tillman* v. *Burge*,
    813 F. Supp. 2d 946 (N.D. Ill 2011) ...........................................................................13

*United Bhd. of Carpenters* v. *Scott*,
    463 U.S. 825 (1983).............................................................................................5, 9, 10

*Vakilian* v. *Shaw*,
    335 F.3d 509 (6th Cir. 2003) ......................................................................................6

*Wells* v. *Rhodes*,
    928 F. Supp. 2d 920 (S.D. Ohio 2013) .......................................................................9

*Williams* v. *Aetna Fin. Co.*,
    700 N.E.2d 869 (Ohio 1998) ...............................................................................16, 17

**Statutes**

42 U.S.C. § 1982.............................................................................................................9, 10

42 U.S.C. § 1985................................................................................................ *passim*

42 U.S.C. § 1986..................................................................................................................13

Ohio Rev. Code § 2307.60....................................................................................................15

Ohio Rev. Code § 2307.70....................................................................................................15

Ohio Rev. Code § 2903.22....................................................................................................16

Ohio Rev. Code § 2917.01....................................................................................................17

Ohio Rev. Code § 2917.21.............................................................................................15, 16

Ohio Rev. Code § 2927.12.............................................................................................18, 19

**Other Authorities**

Jeff Tischauser, *Neo-Nazi Ex-Marine Buys Up Land in Rural Maine for 'Blood Tribe'*, Southern Poverty Law Center (July 27, 2023). ...........................................17

Fed. R. Civ. P. 8(a)(2).............................................................................................................5

U.S. Const. amend. XIII..................................................................................................9, 10

## PRELIMINARY STATEMENT

In July 2024, members of a neo-Nazi organization called the Blood Tribe launched a coordinated conspiracy to "hit" the City of Springfield, Ohio (the "City"), in a deliberate effort to terrorize its residents and disrupt what the Blood Tribe demonized, in explicitly racist terms, as an "invasion" by Haitian immigrants. This violent, white supremacist campaign was orchestrated by Defendant Christopher Pohlhaus, the founder and leader of Defendant Blood Tribe, whose avowed mission is to wage a "righteous war" against nonwhite individuals and those who support them. Acting under Pohlhaus' direction, Blood Tribe members carried out a campaign of intimidation that included armed public demonstrations under swastika flags; threats and harassment targeting City Commissioners and City residents; the incitement of bomb threats against schools, hospitals, and government buildings; and calculated efforts to instill fear, including death threats, delivery of suspicious packages, and the creation of fake online dating profiles to lure strangers to their targets' homes. These acts terrorized the Springfield community for months, triggering evacuations, diverting and draining limited law enforcement and emergency resources, and sowing widespread fear. Through this action, Plaintiffs—City Commissioners, City residents, the Mayor and Assistant Mayor, and the City itself—seek to hold Pohlhaus and his co-conspirators accountable for their racially motivated and unlawful assault on the City, the Haitian community, and those who stood with them.

After months of evading service, Pohlhaus—appearing *pro se*—filed a perfunctory Motion to Dismiss on July 21, 2025 (the "Motion"). ECF No. 20. The Motion fails to engage with any of the nine federal and state causes of action asserted in the Complaint. Instead, it advances only two baseless arguments: first, that the Complaint purportedly fails to allege Pohlhaus' personal involvement in, or awareness of, the conspiracy he himself orchestrated and led; and second, that

1

Plaintiffs' conspiracy claims are barred by the "intracorporate conspiracy doctrine." *Id.* at PageID 206. As detailed below, neither contention has merit. Although Pohlhaus fails to substantively address any of the individual claims, Plaintiffs—mindful of the "active interpretation" afforded to *pro se* filings, *Franklin* v. *Rose*, 765 F.2d 82, 85 (6th Cir. 1985)—address the sufficiency of each cause of action, all of which are more than adequately pleaded.

## FACTUAL BACKGROUND[1]

Defendant Pohlhaus is the founder and self-proclaimed "Blood King" of the Blood Tribe, a neo-Nazi organization he created for the express purpose of violating the civil rights of racial and ethnic minorities. ECF No. 1 ¶ 26, PageID 9. Pohlhaus openly advocates for a "righteous war" by "Aryan" men against nonwhite people, and formed the Blood Tribe as a vehicle to execute that agenda. *Id.* at ¶ 46, PageID 12–13. After attracting followers, Pohlhaus transformed the group into a hierarchical membership-based organization, with himself at the apex. *Id.* at ¶ 47, PageID 13. Prospective recruits of the Blood Tribe undergo a so-called "blood ritual," in which they cut themselves with a ceremonial spear, a rite intended to signify allegiance to Pohlhaus and his white supremacist ideology. *Id.* at ¶ 51, PageID 15.

In July 2024, Pohlhaus set his agenda for "righteous war" in motion by directing his followers to launch a coordinated campaign of threats and harassment against the residents and officials of Springfield. *Id.* at ¶¶ 53–55, PageID 15–16. As alleged in the Complaint, Pohlhaus initiated the intimidation campaign against Springfield's community of legal Haitian immigrants and its supporters by commanding his followers through social media to "hit Springfield." *Id.* at ¶ 55, PageID 16. Pohlhaus further incited his followers by insisting that "NOWHERE IS SAFE" from "hordes of orcs"—his racist slur for Haitians—unless action was taken. *Id.*

---

[1] Facts relevant to this Memorandum are set forth in the Complaint and incorporated fully herein.

2

Pohlhaus' co-conspirators heeded the call. On August 10, Defendant Drake Berentz and at least 11 other co-conspirators began their terror and intimidation campaign with an armed march at Springfield's annual Jazz and Blues festival, toting assault rifles and black flags emblazoned with swastikas. *Id.* at ¶¶ 58–61, PageID 17–18. The group's message was clear: those who support integration efforts risk violent retaliation. Defendant Berentz underscored that message at a City Commission meeting on August 27, where he threatened the Commission with further escalation if integration efforts did not cease. *Id.* at ¶¶ 66–71, PageID 19–20.

The Blood Tribe's threatened escalation continued on September 12, when the conspirators and their followers began issuing bomb threats to City Hall threatening to kill children attending school, City Commissioners, and other public servants. *Id.* at ¶¶ 74–86, PageID 21–25. The City received at least 33 bomb threats, forcing evacuations of public buildings, including an elementary school. *Id.* at ¶ 75, PageID 21. The volume, scope, and specificity of these threats reflected a coordinated campaign to further carry out Pohlhaus' directive to "hit Springfield," and echoed the dehumanizing rhetoric of Blood Tribe's public posts. *See id.* at ¶¶ 75–86, PageID 21–25.

Pohlhaus' co-conspirators continued to carry out his instructions, sending a uniformed detachment to intimidate Mayor Rob Rue at his home and dropping off Haitian immigrants on his lawn. *Id.* at ¶¶ 88–91, PageID 25–26. They posted harassing messages and personal information about Plaintiff Commissioners Tackett and Brown, as well as Plaintiffs Shafer (a social worker and advocate for the Haitian community), Comer (who welcomed Haitians as neighbors at a public meeting), and Rollins (the executive director of a Catholic charitable organization that helps immigrants) online. *Id.* at ¶¶ 92–97, 108–09, 111, 115, 118–19, 124, PageID 26–27, 28–30, 32–35, 36–37. A Blood Tribe member left numerous threatening voicemails and messages for Plaintiff Flora (who obtains grants to strengthen English as a Second Language programs), and

sent a suspicious package to her home with the message "XOXO Blood Tribe." *Id.* at ¶¶ 98–105, PageID 27–28.  The group also targeted Plaintiff Rollins with racist slurs—calling her a "nigger lover"—and called in false police reports to her home.  *Id.* at ¶¶ 117, 120, PageID 33, 35.  In a particularly insidious tactic, the conspirators created fake dating profiles linked to Flora, Shafer and Comer, and used the profiles to lure strangers seeking sex and drugs to their homes late at night.  *Id.* at ¶¶ 104, 110, 112, 125–130, PageID 28, 30, 31, 37–39.  The Blood Tribe taunted Shafer and her partner on social media, asking whether Shafer "make[s] the niggers at your door as comfortable as you want the Haitians to be?"  *Id.* at ¶ 114, PageID 31–32.

Pohlhaus' involvement in and command of the conspiracy continued throughout.  As the actions against Plaintiffs and Springfield intensified, Pohlhaus publicly declared that "[o]ur boots are literally on the ground [in Springfield] every week," "[w]e have a network of local informants," and "[w]e have marched there under the Swastika and . . . will continue to do so."  *Id.* at ¶ 26, PageID 9.  He boasted to his followers that, "[w]e put Springfield in the public consciousness." *Id.*  The Complaint further alleges that Pohlhaus directly sent at least some of the many threatening telecommunications, and otherwise targeted Plaintiffs with threats and incitements to violence.  *Id.* at ¶¶ 168, 177, 183, PageID 46–47, 48, 49.

After this litigation was filed, Pohlhaus deliberately evaded service for months, while publicly boasting about doing so.  *See* ECF No. 13, PageID 132 (Pohlhaus proclaiming on a podcast that "they still haven't been able to find me.").  Despite raising money for legal fees, Pohlhaus filed his Motion to Dismiss *pro se*, one day before the deadline for default.  ECF No. 20.

## LEGAL STANDARD

Rule 8(a)(2) requires only "[f]actual allegations . . . enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 545, 555 (2007).  Courts

4

"construe the complaint in the light most favorable to the plaintiff and accept all allegations as true," and a complaint will survive a motion to dismiss for failure to state a claim so long as it includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *James* v. *Hampton*, 592 F. App'x 449, 454 (6th Cir. 2015).

## ARGUMENT

The Complaint details a sustained, months-long campaign of harassment and intimidation carried out by the Blood Tribe as part of a conspiracy directed by Pohlhaus to target Springfield's Haitian community and those who stood in solidarity with it.  Pohlhaus failed to respond to any of Plaintiffs' nine causes of action.  *See Alahverdian* v. *Nemelka*, 2015 WL 5004886, at *8 (S.D. Ohio 2015) (Rose, J.) (denying motion to dismiss where defendant "points to no particular element of any of the 5 causes of action and claims that it is missing.").  As noted above, although Pohlhaus raises only two meritless arguments, Plaintiffs briefly address the elements of each of the causes of action in turn, all of which are adequately alleged and supported by detailed factual allegations.

### I.        Count I: Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1985

Congress enacted § 1985(3) as part of the Ku Klux Klan Act (the "Klan Act") during Reconstruction to "combat the prevalent animus against Negroes and their supporters."  *United Bhd. of Carpenters* v. *Scott*, 463 U.S. 825, 836 (1983).  This case thus evokes the Klan Act's core original purpose.  The statute provides "redress for persons victimized by . . . acts of terror and intimidation" and "a civil remedy for damages against wholly private infringements of constitutionally protected rights." *Bergman* v. *United States*, 551 F. Supp. 407, 413 (W.D. Mich. 1982) (citing *Griffin* v. *Breckenridge*, 403 U.S. 88 (1971)).

To sustain a claim under § 1985(3),  Plaintiffs must allege four elements:

(1) a conspiracy;

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) an act in furtherance of the conspiracy;

(4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Vakilian* v. *Shaw*, 335 F.3d 509, 518 (6th Cir. 2003).

Pohlhaus cannot and does not dispute that the Complaint alleges each element required to sustain a claim under § 1985(3). Rather, he makes the audacious argument that the Complaint fails to adequately allege his personal involvement in, or awareness of, the very conspiracy that he founded, incited, and directed. *See* ECF 20, PageID 206. That argument is baseless.

### A. Existence of a Conspiracy

To plead a civil rights conspiracy, a plaintiff must allege "an agreement between two or more persons to injure another by unlawful action." *Bazzi* v. *City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). An express agreement among all participants is not required. *Id.* Nor must every conspirator "have known all of the details of the illegal plan or all of the participants involved"; rather, "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy." *Saunders* v. *Valverde*, 2012 WL 2918516, at *4 (S.D. Ohio July 17, 2012) (quoting *Hooks* v. *Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)).

Pohlhaus does not and cannot dispute that the Complaint plausibly alleges a conspiracy. The allegations set forth a detailed agreement among members of the Blood Tribe—an organization founded and led by Pohlhaus, and which requires a blood ritual for membership—to carry out unlawful acts in Springfield. ECF No. 1 ¶¶ 25, 51, PageID 9, 15. Pohlhaus exercised his leadership over the conspiracy when, in July 2024, he directed his followers to "hit

6

Springfield," citing "over 20,000 Haitian invaders [who] have been shipped into Springfield," and had "caused significant strain on the good White residents of the city." *Id.* at ¶¶ 54–55, PageID 15. That directive was disseminated among his "tribe" and echoed as a mobilizing call to action: "ALL GROUPS AND ORGS NEED TO HIT SPRINGFIELD, OHIO." *Id.* at ¶ 56, PageID 17.

Defendants' conspiracy was thereafter meticulously organized and executed. By early August, members of the Blood Tribe descended on Springfield's City Hall in a U-Haul truck, each wearing black and red uniforms and black masks to hide their identities, and carrying black flags emblazoned with Nazi swastikas. *Id.* at ¶ 59, PageID 17–18. Reflecting the militarized organization of the effort, official Blood Tribe social media accounts boasted about deploying a "smaller local detail" used to attack the City and warned that "we will definitely be back." *Id.* at ¶ 65, PageID 19. Defendants made good on that promise: by late August, Blood Tribe members again "hit" Springfield by disrupting City Council meetings and unleashing a torrent of bomb and death threats. *See, e.g., id.* at ¶¶ 66, 75–86, PageID 19, 21–25. Blood Tribe social media channels actively encouraged harassment of the Plaintiffs and provided the means to do so, resulting in sustained doxing and threats over the course of months. *Id.* at ¶¶ 16, 18, 20, 21, 109, PageID 6–7, 29–30. In late September 2024, conspirators gathered outside Plaintiff Mayor Rue's home, again wearing identical black and red uniforms and black masks, holding swastika flags and issuing threats. *Id.* at ¶ 88, PageID 25. Pohlhaus and the Blood Tribe proudly publicized the event online, declaring: "We paid another official visit to our beloved Springfield, and Mayor Rue's house in particular—and no, we weren't singing Christmas carols. We also crashed a fag event near Columbus and caused lots of crying and emotional meltdown." *Id.* at ¶ 89, PageID 25–26. The Sixth Circuit has acknowledged that "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all conspirators[; thus,] circumstantial evidence may provide

adequate proof of conspiracy." *Bazzi*, 658 F.3d at 606.   But here, no inference is needed—the conspiracy was overt, coordinated, and the entire point.

Rather than contest any of the detailed allegations of the conspiracy itself, Pohlhaus instead brazenly argues that the Complaint does not adequately establish his own *personal* role in the conspiracy, asserting that "[t]he complaint does not explain how or when Pohlhaus directed anyone to do anything in Springfield" nor "what knowledge Pohlhaus had about the complained of activities of Blood Tribe[.]"   ECF No. 20, PageID 206.   Pohlhaus is flatly wrong.   As an initial matter, it is black-letter conspiracy law that "each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Bazzi*, 658 F.3d at 602.   But here, Pohlhaus was not a peripheral figure; he was the architect and leader of the conspiracy.   The Complaint details Pohlhaus' efforts to cultivate, expand, and direct the Blood Tribe and identifies his explicit command to his followers to "hit Springfield."   ECF No. 1 ¶ 55, PageID 16.   His co-conspirators obeyed that directive, launching a months-long campaign of terror.   Pohlhaus further incited their efforts as the conspiracy intensified, publicly boasting that "[o]ur boots are literally on the ground [in Springfield] every week" and "[w]e have a network of local informants." *Id.* at ¶ 26, PageID 9.   He later declared that the Blood Tribe had "pushed Springfield into the public consciousness." *Id.* at ¶ 74, PageID 21.   These are not stray comments, but affirmations of control and awareness, from the self-proclaimed "Blood King" of the conspiracy.   In short, all of the Blood Tribe's actions were in line with, and directly followed, the dictates of Pohlhaus, and Pohlhaus publicly demonstrated his knowledge thereof.[2]

---

[2] Notably, though Defendants very publicly boasted about their execution of the conspiracy, they individually acted anonymously, evidencing their knowledge of the unlawfulness of their actions.   They wore masks to conceal their identities, and engaged in anonymous online actions like doxing, bomb threats, and death threats. *See, e.g.,* ECF No. 1 ¶¶ 5–6, 16, 18, 57, PageID 3–4, 6–7, 17.   Accordingly, Plaintiffs anticipate that discovery will further reveal Pohlhaus' participation in the planning and overt acts of the conspiracy; at this stage, however, Pohlhaus' involvement

### B.  Purpose of the Conspiracy

To satisfy the purpose prong of the conspiracy test, "a plaintiff is required to show: (1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action, and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment."  *Wells* v. *Rhodes*, 928 F. Supp. 2d 920, 929 (S.D. Ohio 2013).

There is no credible dispute that the actions of Pohlhaus and his co-conspirators were motivated by racial and religious animus.  The Complaint is replete with specific allegations of explicit racism and antisemitism animating the Blood Tribe's conduct.  *See, e.g.*, ECF No. 1 ¶ 55, PageID 16 (Pohlhaus directing the Blood Tribe to "hit" Springfield because "you cannot flee to a small town and expect to be away from the hordes of orcs"—his racist term for Haitians); *Id.* at ¶ 24, PageID 8 (Blood Tribe stating that they "despise jew[s] . . . niggers and all non Whites [sic]"); *see also id.* at ¶¶ 61, 69, 88, 100 at PageID 18, 20, 25, 27.

As for the second element—the object of the conspiracy—the Supreme Court has applied "§ 1985(3) to private conspiracies aimed at interfering with rights constitutionally protected against private . . . encroachment."  *Scott*, 463 U.S. at 833.  While § 1985(3) does not itself create a substantive right, *see Rhodes*, 928 F. Supp. 2d at 929, it provides a remedy where conspiracies infringe upon rights guaranteed by other sources of law—most relevant here, the right to be free from racialized violence guaranteed by the Thirteenth Amendment, and the right to be free from racially motivated interference with property rights under 42 U.S.C. § 1982.  Federal courts have consistently applied § 1985(3) to such private conspiracies.  In *Wells*, for example, the court

---

is more than adequately pled.  *See, e.g.*, *Abels* v. *Farmer Commodities Corp.*, 259 F.3d 910, 921 (8th Cir. 2001) ("We think it only fair to give [plaintiffs] that benefit [of discovery] before requiring them to plead facts that remain within the defendants' private knowledge."); *see also Genaw* v. *Garage Equip. Supply Co*, 856 F. App'x 23, 29 (6th Cir. 2021).

sustained a § 1985(3) claim where defendants burned a cross on the plaintiffs' lawn, holding that § 1982 "protects citizens against private infringements on their property rights" and provides a basis for § 1985(3) liability. *Id.* at 930–31. In *Griffin* v. *Breckenridge*, 403 U.S. 88, 105 (1971), the Supreme Court held that § 1985(3) reached a private conspiracy by white men who assaulted three Black men on a public highway in violation of the Thirteenth Amendment. Courts have reaffirmed this reasoning in recent similar cases. *See Sines* v. *Kessler*, 324 F. Supp. 3d 765, 781–82 (W.D. Va. 2018) (applying § 1985(3) to a white supremacist conspiracy to attack Charlottesville and concluding the Thirteenth Amendment provided the underlying right); *Sealed Plaintiff 1* v. *Patriot Front*, 2024 WL 1395477, at *24 (E.D. Va. Mar. 31, 2024) (sustaining § 1985(3) claim against white supremacists who defaced a racial justice mural).

Moreover, courts have repeatedly made clear that Section 1985(3) was enacted "to combat the prevalent animus against Negroes *and their supporters*." *Scott*, 463 U.S. at 836 (emphasizing that the statute reaches "class-based animus . . . against Negroes and those who championed their cause") (emphasis added); *Kessler*, 324 F. Supp. at 780–81 (following *Scott* and sustaining § 1985(3) claim where "Plaintiffs have plausibly alleged that they were attacked because of their support of non-white racial minorities"); *see also Cameron* v. *Brock*, 473 F.2d 608, 610 (6th Cir. 1973) (sustaining § 1985(3) claim based on conspiracy directed at supporters of county sheriff's election campaign); *Azar* v. *Conley*, 466 F.2d 1386, n.5 (6th Cir. 1972) (acknowledging broad reading of § 1985 to include "any person or group that is the subject of invidious discrimination"). This principle aligns with other civil rights doctrines recognizing associational discrimination. *Cf. Johnson* v. *Univ. of Cincinnati*, 215 F.3d 561, 574 (6th Cir. 2000) (under analogous Civil Rights Act provision, plaintiff "need not be a member of a recognized protected class; he need only allege that he was discriminated against based on his association with a member of such a class").

Here, the object of the conspiracy was explicit: to discriminatorily deprive Haitian, Jewish, and other nonwhite individuals—and those who supported them—of their rights to be free from racialized violence and to enjoy their property without racially motivated intimidation. *See, e.g.*, ECF No. 1 ¶ 136, PageID 40. Again, the Court need not divine this objective from ambiguous conduct; Pohlhaus and his co-conspirators repeatedly and publicly articulated their aims. *See, e.g.*, *id.* at ¶ 55, PageID 16 (Pohlhaus directing followers to "hit Springfield" in response to the arrival of "hordes of orcs"); *Id.* at ¶ 60, PageID 18 (armed conspirators chanting "we hear you have a Haitian problem, we're here to help"); *Id.* at ¶ 69, PageID 20 (Defendant Berentz warning that "crime and savagery will only increase with each Haitian you bring in"). Plaintiffs were identified and targeted by Pohlhaus and his co-conspirators because of their public support for Springfield's Haitian community. *See, e.g.*, *id.* at ¶ 5, PageID 3 (Blood Tribe "target[ed] Springfield officials they claimed were 'complicit' in the purported 'invasion' of Haitian immigrants"); *Id.* at ¶ 18, PageID 6–7 ("Shafer was also targeted by the Blood Tribe after she spoke out in support of the Haitian community at City Commission meetings"); *Id.* at ¶ 21, PageID 7 (Blood Tribe "doxed [Plaintiff] Comer after he spoke favorably about the Haitian residents at a City Commission meeting"). The object of the conspiracy was further made plain by the relentless racialized intimidation, harassment, and interference with property rights at the hands of the conspirators. *See, e.g.*, *id.* at ¶¶ 76–77, PageID 22 (bomb threats causing evacuation of city buildings); *Id.* at ¶¶ 88–89, PageID 25–26 (conspirators gathering outside Mayor Rue's home and issuing threats); *Id.* at ¶¶ 93–96, PageID 26–27 (threats against Tackett and Brown); *Id.* at ¶¶ 101–02, PageID 27 (threats of sexual violence against Flora); *Id.* at ¶¶ 110–12, PageID 30–31 (conspirators sending strangers to Shafer's home).

### C.  Overt Acts and Injuries

Pohlhaus does not contest the sufficiency of the Complaint with respect to the third and fourth elements of a § 1985(3) conspiracy claim, namely an overt act and injury.  Nor could he: the Complaint is replete with allegations of both.  *See, e.g.*, *id.* at ¶ 61, PageID 18 (harassment); *Id.* at ¶ 69, PageID 20 (threats to City Commissioners); *Id.* at ¶¶ 75–83, PageID 21–24 (bomb threats); *Id.* at ¶¶ 88, PageID 25 (harassment and intimidation of Plaintiff Rue); *Id.* at ¶¶ 92–97, PageID 26–27 (harassment and intimidation of Plaintiff City Commissioners); *Id.* at ¶¶ 98–105, PageID 27–28 (harassment and intimidation of Plaintiff Flora); *Id.* at ¶¶ 106–15, PageID 28–33 (harassment and intimidation of Plaintiff Shafer); *Id.* at ¶¶ 116–22, PageID 33–35 (harassment and intimidation of Plaintiff Rollins); *Id.* at ¶¶ 123–31, PageID 36–39 (harassment and intimidation of Plaintiff Comer).  The Complaint specifically identifies the injuries suffered by Plaintiffs as a result of these acts.  *See, e.g.*, *id.* at ¶¶ 62, 91, 96, 121–22, 129, 139, PageID 18, 26–27, 35, 38, 41.

In short, Plaintiffs have alleged each element required to sustain a claim under § 1985(3).

### D.  The Intracorporate Conspiracy Doctrine Is Inapplicable

Pohlhaus's sole other argument—apart from disclaiming his role in the organization he founded and leads—is that the "conspiracy causes of action are all barred by the doctrine of incorporate conspiracy."  ECF 20, PageID 206.  Once again, Pohlhaus is wrong.

The intracorporate conspiracy doctrine reflects the general rule that a corporation cannot conspire with its own agents or employees, because when "all of the defendants are members of the same collective entity, there are not two separate people to form a conspiracy." *Hull* v. *Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509–10 (6th Cir. 1991). But that doctrine applies to corporations and other legally unified entities—not to unincorporated

associations like the Blood Tribe. Indeed, another federal court has flatly rejected this very same argument when raised by another white supremacist group, holding that "[a]s an unincorporated association, Patriot Front has no separate legal existence distinct and apart from its members," and therefore the intracorporate conspiracy doctrine did not apply. *Patriot Front*, 2024 WL 1395477, at *18 (collecting cases); *see also In re Jackson Lockdown/MCO Cases*, 568 F. Supp. 869, 880 (E.D. Mich. 1983) (intracorporate conspiracy doctrine inapplicable to "unincorporated union").

Moreover, even if the Blood Tribe were a corporation, it still would not be entitled to the protections of the intracorporate conspiracy doctrine. The Sixth Circuit has held that the doctrine does not shield corporations formed "for the purpose of depriving citizens of their civil rights." *Johnson* v. *Hills & Dales Gen. Hosp.*, 40 F.3d 837, 840 (6th Cir. 1994). As that court explained, organizations such as the Ku Klux Klan cannot invoke the doctrine to immunize conspiratorial conduct. *Id.* The same principle applies here. The Blood Tribe is a neo-Nazi organization that calls on "Aryan men to participate in a 'last stand, a righteous war' against non-Whites." ECF No. 1 ¶ 46, PageID 12–13. Accordingly, even if the doctrine were otherwise applicable—which it is not—neither the Blood Tribe nor its members, including Pohlhaus, would fall within its protection.

## II. Count II: Failure to Prevent Interference with Civil Rights Under 42 U.S.C. § 1986

Count II asserts a claim under 42 U.S.C. § 1986, which "establishes a cause of action against anyone who is aware of a § 1985 conspiracy and could have stepped in to prevent it, but fails to do so." *Tillman* v. *Burge*, 813 F. Supp. 2d 946, 987 (N.D. Ill. 2011); *Bergman*, 551 F. Supp. 407, 415.

Here, as set forth above, the Complaint alleges that Pohlhaus not only had knowledge of the conspiracy and the power to prevent it, ECF No. 1 ¶¶ 46–55, 144, PageID 12–16, 41–42, but that he fomented the conspiracy and called its members into action. *See supra*, pp. 7–9. At the

height of the campaign against Plaintiffs, rather than prevent additional harm, Pohlhaus further incited the conspiracy, declaring that the Blood Tribe's "boots are literally on the ground every week" and that they "have marched there under the Swastika and . . . will continue to do so." ECF No. 1 ¶ 26, PageID 9. This is more than sufficient to establish a violation of § 1986 by Pohlhaus. *See Kessler*, 324 F. Supp. at 798–99; *Bergman*, 551 F. Supp. at 415.

### III.     Count III: Common Law "Absolute" Public Nuisance

Under Ohio law, a common law public nuisance is defined as "an unreasonable interference with a right common to the general public," including the rights to public health, safety, and welfare. *See In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 632 (N.D. Ohio 2020). Such nuisances include "those acts that significantly interfere with public health, safety, peace, comfort, or convenience; conduct that is contrary to a statute, ordinance, or regulation; or conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right[.]" *Cincinnati* v. *Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002). A nuisance is considered "absolute" when it arises from intentional conduct or from an abnormally dangerous condition that inherently results in risks of injury regardless of the level of care taken. *Beck* v. *Stony Hollow Landfill, Inc.*, 2017 WL 1551216, at *3 (S.D. Ohio May 1, 2017).

Here, the Complaint states a public nuisance claim based on the intentional conduct of Pohlhaus and his co-conspirators, including a sustained campaign of harassment and intimidation directed at public officials, ECF No. 1 ¶¶ 87–97, PageID 25–27; the issuance and incitement of bomb and death threats, *Id.* at ¶¶ 72–86, PageID 20–25; and the deliberate disruption of public events and spaces through threatening demonstrations. *Id.* at ¶¶ 60–62, PageID 18. The actions of the Blood Tribe generally, and of Pohlhaus specifically, substantially interfered with public peace and safety. Their conduct forced evacuations of government buildings, diverted emergency services from other pressing public duties, and caused widespread fear that led to, *inter alia*,

absenteeism in the Springfield City School District. *See, e.g.*, *id.* at ¶ 151, PageID 43–44. These are precisely the kinds of harms Ohio nuisance law is designed to remedy.

## IV. Count IV: Telecommunications Harassment[3]

Ohio law prohibits "mak[ing] [a] telecommunication with purpose to harass, intimidate, or abuse any person . . . whether or not actual communication takes place between the caller and a recipient." Ohio Rev. Code § 2917.21(A)(1). The statute also expressly covers threats to "cause damage to or destroy public or private property," where the recipient or a family member lives or works in the targeted property. *Id.* § 2917.21(A)(4). Importantly, the inquiry is not whether the recipient was in fact threatened, harassed, or abused—only the defendant's purpose is assessed. *State* v. *Bragg*, 2019 WL 1503002, at *3 (Ohio Com. Pl. Mar. 19, 2019).

Here, the Complaint alleges that Pohlhaus orchestrated a coordinated campaign of bomb and death threats, racist email messages, and doxing, all aimed at harassing, intimidating, and abusing Plaintiffs and other City employees. *See, e.g.*, ECF No. 1 ¶¶ 54–55, 72–73, 75–83, 93–105, 117, 120, PageID 15–16, 20–24, 26–28, 33, 35. The Blood Tribe also sent strangers to Plaintiffs' homes under false pretenses using telecommunications-based enticements. *See id.* at ¶¶ 110, 112, 125–30, PageID 30, 31, 37–39. Likewise, false police reports submitted against Plaintiff Rollins were made via electronic communication. *See id.* at ¶¶ 117, 120, PageID 33, 35. The Complaint further alleges that Pohlhaus personally "repeatedly sen[t] telecommunications, including phone calls, emails, and other messages with the purpose of harassing, intimidating, or

---

[3] Each of Counts IV–VII constitute violations of the Ohio criminal code. Ohio law permits civil causes of action for such violations. Ohio Rev. Code § 2307.60(A)(1) (counts IV–VI); § 2307.70(A) (count VII); *see, e.g., Jacobson* v. *Kaforey*, 75 N.E.3d 203, 206 (Ohio 2016) (holding § 2307.60 "creates a statutory cause of action for damages resulting from any criminal act"); *A.W.* v. *Kircher*, 244 N.E.3d 732, 741 (Ohio Ct. App. 2024) (sustaining civil claim for telecommunications harassment); *Harris* v. *Cunix*, 187 N.E.3d 582, 587 (Ohio Ct. App. 2022) (sustaining civil claim for menacing by stalking).

abusing Plaintiffs and others," and that he incited others to do the same.[4]  *See id.* at ¶ 167, PageID 46.  These well-pleaded facts more than suffice to state a claim under § 2917.21.

Moreover, this claim—along with Counts V through VII—is pleaded as part of a common law civil conspiracy.  *See* Count VIII, ECF No. 1 ¶ 194, PageID 51.  Under Ohio law, "the acts of coconspirators are attributable to each other," and co-conspirators are jointly and severally liable for all unlawful acts committed in furtherance of the conspiracy.  *Williams* v. *Aetna Fin. Co.*, 700 N.E.2d 869, 868 (Ohio 1998); *CSX Transp., Inc.* v. *Stevenson*, 2017 WL 1968384, at *5 (S.D. Ohio Mar. 15, 2017).  As set forth above, the Complaint clearly alleges that Pohlhaus conspired with Blood Tribe members to commit acts injurious to Plaintiffs.  *See supra*, pp. 7–14; *Aetna*, 700 N.E.2d at 867–68.  He is therefore liable not only for his own telecommunications-based misconduct, but also for that of his co-conspirators.  *See, e.g.*, ECF No. 1 ¶¶ 76–85, 93–95, 100–02, 109-14, PageID 22–24, 26, 27, 29–32.

## V.        Count V: Menacing

Count V asserts a claim for menacing under Ohio law, which prohibits "knowingly caus[ing] another to believe that the offender will cause physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family."  Ohio Rev. Code § 2903.22(A)(1); *see also State* v. *Ozias*, 2003 WL 22326565, at *2 (Ohio Ct. App. Oct. 13, 2003).  Ohio courts have sustained menacing claims based on a combination of "phone calls . . . thinly veiled threats, and . . . face-to-face meetings," even where individual incidents, viewed in isolation, may not appear overtly threatening.  *Lane* v. *Brewster*, 2012 WL 1029503, at *8 (Ohio Ct. App. Mar. 30, 2012).

---

[4] As noted above, Pohlhaus and his followers deliberately used anonymous methods to carry out their campaign of intimidation and harassment.  Accordingly, Plaintiffs anticipate that discovery will further uncover the extent of Pohlhaus's involvement in the telecommunications-based misconduct.  *See supra* n.2.  At this stage, however, the claim is more than sufficiently pleaded.

Here, the Complaint describes a systematic campaign of threats, intimidation, doxing, and bomb scares—conduct expressly designed to cause Plaintiffs to fear physical harm.[5] *See, e.g.*, ECF No. 1 ¶ 26, PageID 9 (Pohlhaus warning "[w]e have a network of local informants" and "have marched there under the swastika and . . . will continue to do so"); *Id.* at ¶ 64, PageID 19 (social media post threatening "[e]xpect to see more of us Springfield. We are not letting this crime go unanswered for"); *Id.* at ¶ 69, PageID 20 (Defendant Berentz telling City Commissioners to "stop what you're doing before it's too late"); *Id.* at ¶¶ 76–79, PageID 22–23 (series of bomb threats); *Id.* at ¶ 88, PageID 25 (masked conspirators assembling outside Mayor Rue's home and warning, "enjoy your peace now, until we come back"); *Id.* at ¶ 114, PageID 31–32 (Blood Tribe sending strangers seeking sex and drugs to approach Shafer's home at night and watching). Furthermore, as described above, beyond Pohlhaus's own threats, the acts of menacing by Pohlhaus's co-conspirators are attributable to him under civil conspiracy principles. *Id.* at ¶ 194, PageID 51; *see Aetna*, 700 N.E.2d at 868; *CSX Transp., Inc.*, 2017 WL 1968384, at *5.

## VI.        Count VI: Incitement to Violence

Count VI asserts a claim under Ohio Rev. Code § 2917.01(A)(1) for inciting to violence, which prohibits knowingly engaging in conduct intended to urge or incite another to commit any offense of violence, where that conduct occurs under circumstances creating a clear and present danger that such violence will occur.

As alleged in the Complaint, Pohlhaus violated § 2917.01(A)(1) by inciting members of the Blood Tribe—an organization he led as the self-proclaimed "Blood King"—to "hit"

---

[5] Pohlhaus has publicly stated his aim is to "go to the enemy, scream at them, *give them PTSD* and leave." Quoted in ECF No. 1 ¶ 52, n.23, PageID 15 (Jeff Tischauser, *Neo-Nazi Ex-Marine Buys Up Land in Rural Maine for 'Blood Tribe'*, Southern Poverty Law Center (July 27, 2023), https://www.splcenter.org/resources/hatewatch/neo-nazi-ex-marine-buys-land-rural-maine-blood-tribe/) (emphasis added). The reference to "PTSD" is to Post-Traumatic Stress Disorder; in other words, Pohlhaus' express aim is to cause trauma.

Springfield and engage in violence against Plaintiffs and other local residents. *See* ECF No. 1 ¶¶ 54–55, 183, PageID 15–16, 49. In the weeks and months that followed, Pohlhaus continued to incite violence, publicly endorsing his followers' actions and escalating the rhetoric with declarations such as "[w]e have a network of local informants" and "[we] have marched there under the swastika and . . . will continue to do so." *Id.* at ¶ 26, PageID 9.

Further, Pohlhaus and his co-conspirators posted denigrating and threatening statements about specific Plaintiffs, shared their home addresses, and urged followers to disseminate the posts and act upon them. *Id.* at ¶¶ 108–30, PageID 28–39. These actions were not theoretical provocations—they created a clear and present danger of imminent violence, and in several cases led directly to real-world confrontations. *Id.* For example, strangers appeared at Plaintiffs' homes seeking sex and drugs, on one occasion requiring Shafer's partner to brandish a firearm, which the Blood Tribe admitted to observing; multiple Plaintiffs received bomb threats; and Plaintiff Rollins was "swatted"—the victim of a false police report meant to trigger the deployment of police to her home. *Id.*

## VII. Count VII: Ethnic Intimidation

Count VII asserts a claim against all Defendants, including Pohlhaus, under Ohio's ethnic intimidation statute, which prohibits engaging in menacing, aggravated menacing, or telecommunications harassment "by reason of the race, color, religion, or national origin of another person or group of persons." Ohio Rev. Code § 2927.12(A). As discussed above, the Complaint adequately pleads both menacing and telecommunications harassment, *see supra* §§ IV & V, and the basis of all of Defendants' conduct was racial and religious animus. *See supra* § I(B).

The statutory text for a claim of Ethnic Intimidation requires only that the motivation of the underlying tort must be race, and Plaintiffs have located no Ohio case holding that the victim of ethnic intimidation must themselves belong to the protected group. Rather, it prohibits acts

committed "by *reason* of the race . . . of another person or group of persons." Ohio Rev. Code § 2927.12(A) (emphasis added). This language expressly encompasses intimidation targeting individuals based on their association with or support for members of a protected group. This reading further aligns with federal civil rights doctrine more broadly; for example, in the context of the analogous Title VII of the Civil Rights Act, the Sixth Circuit has held that a plaintiff "need not be a member of a recognized protected class; he need only allege that he was discriminated against based on his association with a member of such a class." *Johnson*, 215 F.3d at 574. Because Plaintiffs were harassed and menaced specifically "by reason of the race . . . of another person or group of persons"—namely, their support for the Haitian community—they fall within the protections of Ohio's Ethnic Intimidation statute and have standing to bring this claim.

## VIII. Count VIII: Civil Conspiracy

Under Ohio law, the elements of a civil conspiracy are: "(1) a malicious combination; (2) of two or more persons; (3) resulting in injury to person or property; and (4) the commission of an unlawful act independent from the actual conspiracy." *Mangelluzzi* v. *Morley*, 40 N.E.3d 588, 601 (Ohio Ct. App. 2015). As detailed in Section I, the Complaint plausibly alleges a conspiracy fomented and led by Pohlhaus, involving a coordinated campaign by multiple co-conspirators against the City's Haitian community and its supporters. The Complaint also sets forth numerous independent unlawful acts—including harassment, menacing, telecommunications harassment, and ethnic intimidation—that caused concrete harm to Plaintiffs. *See supra* §§ IV–VII. These allegations establish the elements of a civil conspiracy under Ohio law.

## IX. Count IX: Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress ("IIED") under Ohio law requires a plaintiff to allege that: (1) the defendant intended to cause, or knew or should have known that his conduct would result in serious emotional distress; (2) the defendant's conduct was so extreme and

19

outrageous as to go beyond all possible bounds of decency and be considered utterly intolerable in a civilized community; (3) the conduct proximately caused psychological injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it. *Meyers* v. *Hot Bagels Factory, Inc.*, 721 N.E.2d 1068, 1075 (Ohio Ct. App. 1999). To survive a motion to dismiss, it is sufficient for a plaintiff to allege that, as a "direct and proximate cause of Defendants' intentional, reckless and/or negligent infliction of emotional distress[,] plaintiffs have suffered severe humiliation, distress, depression, and anxiety." *Meyers* v. *Cincinnati Bd. of Educ.*, 343 F. Supp. 3d 714, 731 (S.D. Ohio 2018) (citation omitted). Courts have found that injuries such as insomnia, hypervigilance, loss of appetite or focus, and social withdrawal are sufficient to sustain an IIED claim. *Hot Bagels*, 721 N.E.2d at 1073.

Here, extreme emotional distress was the point.[6] As set forth above, Pohlhaus deliberately targeted Plaintiffs with the express purpose of threatening, harassing, and intimidating them. Acts such as doxing Plaintiffs, luring strangers to their homes, issuing bomb and death threats, and publicly threatening that "we have a network of local informants" were calculated to inflict psychological harm and deter Plaintiffs from continuing to support Springfield's Haitian community. *See, e.g.*, ECF No. 1 ¶¶ 26, 201, PageID 9, 53. As a result of these actions, Plaintiffs have suffered significant emotional injuries. *See id.* at ¶ 202, PageID 53.

## CONCLUSION

In short, while Pohlhaus fails to meaningfully address the elements of any of the causes of action asserted in the Complaint, its detailed and specific allegations more than suffice to establish his liability and to support each of the claims asserted against him. For these reasons, Pohlhaus' Motion to Dismiss should be denied in full.

---

[6] Again, Pohlhaus' express aim is to "go to the enemy . . . [and] give them PTSD." *See supra*, n.5.

Respectfully submitted,

James Pasch (0086809)
ANTI-DEFAMATION LEAGUE
605 Third Avenue
New York, NY 10158-3650
Tel: 212-885-7700
jpasch@adl.org

/s/ *Glen R. McMurry*
Glen R. McMurry (0082600)
TAFT STETTINIUS & HOLLISTER, LLP
40 North Main Street, Suite 1700
Dayton, OH 45423-1029
Tel: 937-228-2838
Fax: 937-228-2816
gmcmurry@taftlaw.com

Daniel J. Kramer (*pro hac vice*)
Gregory F. Laufer (*pro hac vice*)
Marques S. Tracy (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: 212-373-3000
Fax: 212-757-3990
dkramer@paulweiss.com
glaufer@paulweiss.com
mtracy@paulweiss.com

***Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 11, 2025, a copy of the foregoing memorandum was filed

electronically. Notice of this filing will be sent by operation of the Court's electronic filing system

to all parties indicated on the electronic filing receipt. Parties may access this filing through the

Court's ECF system.

*/s/ Glen R. McMurry*
Glen R. McMurry
