**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (DAYTON)**

| | | |
|---|---|---|
| CITY OF SPRINGFIELD, OHIO, *et al.*, | : | Case No. 3:25-cv-00033 |
| | : | |
| Plaintiffs, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Caroline H. Gentry |
| vs. | : | |
| | : | |
| THE BLOOD TRIBE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**DECISION AND ORDER**

Currently pending before the Court are several motions filed by Defendant Keith Elflein. For the reasons set forth below, Elflein's Motion to Quash Subpoenas and for Protective Order (Doc. No. 57) is **DENIED**, Elflein's Motion for More Definite Statement (Doc. No. 98) is **DENIED**, Elflein's Motion to Stay Proceedings and Discovery (Doc. No. 99) is **DENIED**, and Elflein's Motion for Interim Protective Order (Doc. No. 100) is **DENIED**. Further, the Court's Order Staying Deposition and Document Production of Non-Party Witness Keith Elflein (Doc. No. 71) is **VACATED**.

**A. Elflein's Motion to Quash Subpoenas & Protective Order (Doc. No. 57)**

Plaintiffs did not name Elflein as a Defendant in their original Complaint (Doc. No. 1). Therefore, when Plaintiffs sought discovery from non-party Elflein by means of a deposition subpoena and subpoena *duces tecum*, Elflein moved to quash the subpoenas pursuant to Rule 45 of the Federal Rules of Civil Procedure and also requested a protective order. (Doc. No. 57.)

However, while Elflein's Motion to Quash was pending, Plaintiffs obtained leave to amend their Complaint and added Elflein as a Defendant. (Amended Complaint, Doc. No. 96.) When Elflein became a party to this case, the Rule 45 subpoenas that Plaintiffs issued to him became moot. *Cf.* Fed. R. Civ. P. 45 (rule governing subpoenas issued to non-parties) *with* Fed. R. Civ. P. 30 (rule governing depositions of parties) *and* Fed. R. Civ. P. 34 (rule governing document requests to parties). Accordingly, Elflein's Motion to Quash Subpoenas and for Protective Order (Doc. No. 57) is **DENIED** and the Court's related Order Staying Deposition and Document Production of Non-Party Witness Keith Elflein (Doc. No. 71) is **VACATED**.[1]

**B. Elflein's Motion for More Definite Statement (Doc. No. 98)**

Before addressing Elflein's Motion for More Definite Statement (Doc. No. 98), the Court will describe the relevant allegations in the Amended Complaint (Doc. No. 96).

Plaintiffs are the City of Springfield, Ohio ("City"), Mayor Rob Rue, City Commissioners Dr. David Estrop, Krystal Brown and Tracey Tackett, and City residents Taylor Flora, Jessica Shafer, and Casey Rollins. (Amended Complaint, Doc. No. 96 at PageID 1569-73.) Defendant Blood Tribe is a purported neo-Nazi white supremacist organization that operates in Springfield and elsewhere in the United States and Canada. (*Id*. at PageID 1573-74.) Plaintiffs allege that Defendant Christopher Pohlhaus is the founder of the Blood Tribe and that Defendants Drake Berentz and Keith Elflein are

[1] The Court notes that it expects to rule shortly on a Motion to Quash filed by non-party Matthew Dwyer (Doc. No. 64) that adopts the substantive arguments raised by Elflein in his Motion to Quash.

leaders of the Blood Tribe. (*Id*. at PageID 1574-76.) Plaintiffs also sue seven John Doe Defendants who allegedly are Blood Tribe associates. (*Id*. at PageID 1576-77.)

Plaintiffs allege that beginning in 2024, Defendants encouraged, coordinated and engaged in a pattern of harassment, intimidation, and threats targeted at City officials and its residents, including its Haitian population. (Amended Complaint, Doc. No. 96 at PageID 1578-1608.) Elsewhere, Plaintiffs have summarized their allegations as follows:

> The Complaint describes in great detail a conspiracy conceived of and implemented by members of the Blood Tribe with the intention of intimidating and terrorizing the residents of Springfield, Ohio (the "City") by, among other things, targeting both the City's Haitian population and those who support it. The Blood Tribe's assault on the City escalated from armed, masked, and menacing demonstrations to outright bomb and death threats directed at Plaintiffs and others. After publicly calling on untold numbers of followers to, in their words, "hit Springfield," Blood Tribe members descended on the City's annual Jazz & Blues festival brandishing assault rifles, waiving swastika flags, and pointing weapons at families attending the event. In the weeks that followed, the City received more than 30 bomb and death threats, forcing evacuations of City Hall, schools, and hospitals. Plaintiffs received threatening calls, messages, and mysterious packages, and strangers were lured to Plaintiffs' homes through fake online dating profiles.

(Doc. No. 69 at PageID# 557.)

Based upon these allegations, Plaintiffs assert nine causes of action: (1) conspiracy to violate civil rights under 42 U.S.C. § 1985(3) (individual Plaintiffs against all Defendants); (2) failure to prevent interference with civil rights under 42 U.S.C. § 1986 (individual Plaintiffs against all Defendants); (3) absolute public nuisance (City of Springfield against Blood Tribe, Pohlhaus, Elflein and Berentz); (4) telecommunications harassment, in violation of Ohio Rev. Code § 2917.21 (all Plaintiffs against all Defendants); (5) a civil action for menacing, in violation of Ohio Rev. Code §§ 2903.21,

2903.22 and 2903.211(individual Plaintiffs against all Defendants); (6) civil liability for inciting violence, in violation of Ohio Rev. Code § 2917.01(A)(1) (all Plaintiffs against all Defendants); (7) ethnic intimidation, in violation of Ohio Rev. Code § 2307.70(A) (all Plaintiffs against all Defendants); (8) civil conspiracy (all Plaintiffs against all Defendants); and (9) intentional infliction of emotional distress (individual Plaintiffs against all Defendants). (Doc. No. 96 at PageID 1609-23.)

The Court observes that the Amended Complaint is fifty-nine pages long and contains 212 paragraphs. Its lengthy and detailed factual allegations (including pictures) span approximately 94 paragraphs and thirty pages. It contains numerous references to Elflein, including but not limited to the following allegations:

> 23. The Blood Tribe is a white supremacist organization, founded by Pohlhaus and led by Pohlhaus, Berentz and Elflein. It is a membership organization that claims seven regional chapters in the United States and two in Canada. It holds rallies where members carry the swastika banner, give the Nazi salute and shout the Nazi chant, 'Sieg Heil!' Blood Tribe leadership recruits members, assesses membership dues, charges fees for participating in events, solicits donations, and sells Nazi-themed merchandise, including the black pants, red shirts, and hoods that comprise the Blood Tribe's uniform.
>
> *****
>
> 28. Keith Elflein, who uses several names including "Herzog Weiss," "Herzog Weiβ, "Barron," and "Baron," is a leader of the Blood Tribe. He admits to being a "visible" and "prominent" Blood Tribe member, someone that younger members "look[] up to … for life advice and wisdom." Pohlhaus has referred to Elflein as his "Number 2" publicly on multiple occasions, which Elflein acknowledges as a "vote of confidence" concerning his "political activism and [Blood Tribe] involvement."

29. Elflein, using the name of Herzog Weiss, openly admitted to coordinating and participating in several of Blood Tribe's activities in Springfield on multiple podcasts hosted by Christopher Pohlhaus. Acknowledging his role in planning, Elflein stated that he and others were "following" Springfield for "around six months" before showing up. Elflein further stated that he was involved in "several operations" and named three specific "actions": (i) Elflein organized the Blood Tribe's August 10, 2024 armed march into Springfield, (ii) Elflein planned the Blood Tribe's presence at the August 27, 2024 City Commission meeting, and (iii) Elflein participated in the September 28, 2024 confrontation of [Mayor] Rue and "marched around the block" and "downtown at the same time." Elflein acknowledged taking several actions online, including creating online posts about Flora and her husband based on their support of the Haitian community. Elflein continues to perpetrate racist rhetoric against Haitians and their supporters, including Tackett on his X account page.

*****

42. This Court has *in personam* jurisdiction over Keith Elflein because the conduct described herein took place substantially in, and was intentionally directed towards the residents of, Springfield. As Elflein stated, "[w]e had several operations that we did in Springfield," recounting each of the three actions he took against the Springfield Haitian community, Mayor Rue, the City Commissioners, and other individuals who voiced support for the Haitian community.

*****

56. While Springfield welcomed its new Haitian neighbors, the Blood Tribe noticed the growing population of immigrants and became enraged. Blood Tribe leaders, including Pohlhaus, Berentz, Elflein, and John Doe 7, "Andail Chanter," plotted to upend the City's program of peacefully integrating its Haitian residents.

57. Elflein admitted on a June 2, 2025 podcast that he and others were "monitoring" Springfield for around six months before showing up in Springfield. He stated that the Blood Tribe was "thinking about doing something localized there," and thereafter executed a plan to "incorporate online activism with boots on the ground with Springfield," noting that activism "set a chain in motion." Elflein declared that "We busted our balls in Springfield and it paid off."

*****

62. As Elflein later admitted on a February 23, 2025 podcast, he was involved in the Blood Tribe's "planning" of "several operations" in Springfield, the first of which was a march the Blood Tribe put together with a "local crew" in downtown Springfield. Elflein noted that "the way we had a plan, like nobody knew we were showing up."

63. The Blood Tribe's first "hit" on Springfield came on August 10, 2024, the second day of the City's annual Jazz and Blues festival.

64. At about 4:35 p.m., a U-Haul truck approached City Hall and unloaded a dozen Blood Tribe members, including, upon information and belief, Elflein, each wearing black and red uniforms with masks to hide their identities. Two carried assault rifles and others waved black flags emblazoned with Nazi swastikas. Only Berentz, the leader of the attack and the Blood Tribe's second-in-command, was unmasked. The group filmed its activities to use later in propaganda and recruitment efforts, to incite its members and stoke more hatred against Springfield. Elflein admitted on a February 23, 2025 podcast to participating in that march, stating that "we marched around and … gave speeches at the town hall."

65. Seeking to intimidate as many residents as possible, the Blood Tribe headed to downtown Springfield where hundreds of people had come to enjoy the Jazz and Blues festival. The group chanted threatening slogans, including, "[we] hear you have a Haitian problem, we're here to help."

66. Residents tried to keep their distance from the racist mob, but some could not avoid their path. One family ran to their car and attempted to leave the scene when the Blood Tribe approached them. The mob yelled racist slurs (including "go the fuck back to Africa") and aimed assault rifles at the terrified family as they hid in their car.

67. Dr. Estrop found the Blood Tribe's use of the swastika to be particularly triggering. Dr. Estrop's father served in the U.S. Army under General George S. Patton and was one of the American servicemen who liberated the Dachau concentration camp in 1945.

*****

71. The Blood Tribe "hit" Springfield again on August 27, 2024, during a City Commission meeting. Arriving in a black BMW with three uniformed Blood Tribe members, including, upon information and belief, Elflein, Berentz entered the meeting and approached the podium to speak. He started by identifying himself using a thinly-veiled racial epithet as a pseudonym: "Nathaniel Higgers of Blood Tribe."

72. Berentz bragged that he led the anti-Haitian disruption on August 10, 2024, during the City's Jazz and Blues Festival.

73. Some attendees, including Flora, recognized Berentz and understood that Berentz and the Blood Tribe represented a virulent form of hate and presented a direct threat to the City and its residents. As she walked out of the meeting, Flora warned the Commissioners that Berentz was "a Nazi" and urged them not to listen to him. Elflein later admitted on a February 23, 2025 podcast that he observed Flora and her husband outside the building, "caught [them] on camera," and afterwards "posted some things about them … teasing them and stuff."

74. Berentz continued to threaten and berate the Commissioners. He stated that he had "come to bring a word of warning," that the Commissioners must "stop what you're doing before it's too late," and threatening that "crime and savagery will only increase with every Haitian you bring in, and with it, public frustration and anger."

75. As Berentz continued his rant, the Commissioners realized that Berentz and his Blood Tribe gang represented an imminent threat to their safety, and the safety of the City. Katie Eviston, Springfield's Director of Finance, fearing an altercation, removed her high heeled shoes so that she could be ready to run.

76. Rue asked Berentz to leave because his statements were threatening. Berentz ignored him, continuing to speak until he was escorted from the podium.

77. Elflein later admitted on a February 23, 2025 podcast that the Blood Tribe's "first appearance" "blew up" the "local process" and "led to some fallout that caused us to return, particularly with the mayor." Specifically, Elflein stated that the Blood Tribe "decided at that point, well we're going to go to the Town Hall meeting and confront him about his lies, so that's what led to that second action in Springfield where Nate Higgers [Berentz] went and spoke on our

behalf." Elflein admitted on the same podcast that he observed Berentz's speech and left with the group afterwards.

*****

93. Defendants have targeted Rue with physical intimidation and threats of violence.

94. Elflein admitted on a February 23, 2025 podcast that the Blood Tribe decided to "finish our speech at [Rue's] home" with a "small detail of guys."

95. On September 28, 2024, Berentz, Elflein, and about a dozen Blood Tribe members, wearing red shirts, black clothes, and black face masks and holding swastika flags, gathered outside of Rue's home. Elflein admitted on a February 23, 2025 podcast that they "weren't singing Christmas carols to him" and observed a security guard watching them. The men warned Rue to "enjoy your peace now, until we come back." Fearing for his safety and that of his family, Rue had his shotgun loaded and by the front door of his home in case he needed to protect his family.

96. Elflein admitted on a February 23, 2025 podcast that on the same day, the Blood Tribe "march[ed] around the town" including around Rue's block "a couple times" and "downtown at the same time."

*****

100. Springfield City Commissioners have been the target of threats from the Blood Tribe or those incited by the Blood Tribe. As noted earlier, the bomb threat on September 12 mentioned each Commissioner by name, and included the chilling message, "I will kill you, I know where you live."

101. Tackett's personal information was posted on X (formerly known as Twitter), and "retweeted" by Elflein. One post from February 11, 2026, that was "retweeted" by Elflein, publicized her work email, City titles, and LinkedIn profile, alluding to the "large Haitian presence" in Springfield, Ohio where she serves as Assistant Mayor. As a result, she received numerous threats and hateful messages to her email and on social media. Her inbox has been so flooded with cruel and threatening emails that she records them in a "Haters" folder.

*****

104. After Flora warned Springfield's Commissioners that Berentz was a Nazi, the Blood Tribe, including John Doe 1, began a campaign of harassment against her.

105. On August 31, 2024, within a 15-minute span from 11:23 p.m. to 11:38 p.m., Flora received nine harassing and violent voicemails from John Doe 1.

106. On September 1, 2024, at 11:49 a.m., Flora received an email from John Doe 3 asking if she would "write us a grant to remove all of the Haitian niggers out of Springfield" and stating "[s]urely there must be some money available somewhere for that." The email threatened to "find out" if Flora's partner was "making money off the landlords housing" the Haitian immigrants.

107. On September 1, 2024, at 3:06 p.m., Flora received another voicemail from John Doe 1, who let her know that he knew a great deal about her and her family. John Doe 1 identified the name of the street she lives on, referred to her husband, claiming that he is "making money off the landlords housing these niggers," and referred to Flora's work writing grants, asking her to "write us a grant to remove all of the Haitian niggers out of Springfield."

108. Flora received a message from John Doe 1 on September 4, 2024, threatening her and hinting at sexual violence: "I'm looking for a fat woman. Maybe your the lucky one. Haha just kidding fuck you nigger lover. Love from the blood tribe[.]"

109. On September 11, 2024, Flora received a package with a return address purportedly for a P.O. box located in Slovakia sent by John Doe 2. Flora called the Springfield police and asked for the bomb squad to confirm the package did not contain an explosive. It did not, but it did contain a note that read, "XOXO, Blood Tribe."

110. In mid-September, the Blood Tribe, including at least John Doe 4, sent strangers to Flora's house at night. The first man stood at the door, but Flora did not answer. He eventually returned to his truck and remained there for approximately 20 minutes. Flora called the police, but the man drove away before they arrived.

111. The second man arrived shortly thereafter, and the police were waiting for him. He told the police that he had been sent to Flora's home based on a fake profile set up on Flora's behalf on a dating application and was instructed to enter the house without knocking.

> 112. On a February 23, 2025 podcast, Keith Elflein admitted to using "online activism" in Springfield, including "post[ing] some things about" Taylor Flora and her husband, "teasing them and stuff."

(Doc. No. 96, PageID 1573, 1575-76, 1578-79, 1582, 1584-87 & 1592-96.)

"A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). The moving party "must point out the defects complained of and the details desired." *Id*.

Given the level of detail set forth in the Amended Complaint, Elflein cannot (and does not) argue that Plaintiffs' factual allegations are vague and ambiguous. Instead, he argues that Plaintiffs' nine causes of action are deficient because they do not "say whether those acts are alleged to have been personally committed by Elflein, caused or incited by him, or imputed to him under one of two different conspiracy counts or another theory." (Doc. No. 98, PageID 1628.) Elflein claims that "[w]ithout that distinction, [he] cannot determine what he must admit or deny, which statutory subsection he personally allegedly violated, whose conduct is being attributed to him, or what affirmative defenses may apply." (*Id*.) Elflein seeks this relief:

> Elflein therefore requests an order directing Plaintiffs to file a second amended complaint that, for each count asserted against Elflein: (1) identifies with specificity the conduct attributed directly to Elflein; (2) identifies any conduct attributed to another actor but specifically imputed to Elflein and the legal basis for doing so; (3) identifies the plaintiff or other person to whom the conduct was specifically directed; (4) identifies the precise speech or conduct alleged to fall outside First Amendment protection, or the specific basis for derivative liability based on another actor's unlawful conduct; (5) identifies the statutory subsection or predicate offense invoked; and (6) identifies the numbered factual allegations supporting the count.

(Doc. No. 98, PageID 1628.)

Elflein's Motion for More Definite Statement is not well-taken. Simply put, complaints that are filed in federal court do not require the level of detail that he seeks. Instead, each complaint "must contain … a ***short and plain*** statement of the claim [for relief] showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). "Each allegation must be simple, concise, and direct" and "[n]o technical form is required." Fed. R. Civ. P. 8(d)(1).

The Amended Complaint is not short, but it is plain, and its factual and legal allegations are not vague or ambiguous. Elflein's insistence that Plaintiffs must clarify which Defendant(s) committed which act(s) in their operative pleading, and whether and how each such act is attributable to Elflein, is unreasonable and borders on absurdity, since Defendants allegedly wore masks and used pseudonyms in a deliberate attempt to hide their identities. Further, neither Rule 12(e) nor any other Federal Rule of Civil Procedure requires Plaintiffs to describe every nuance of their legal theories in their operative pleading. *See* Fed. R. Civ. P. 9 (describing those matters that must be pled with specificity); Fed. R. Civ. P. 12(e) Advisory Committee Note to 1946 Amendment (noting that "[r]eferences in this subdivision to a bill of particulars have been deleted" and that "[t]he tendency of some courts freely to grant extended bills of particulars has served to neutralize any helpful benefits derived from [R]ule 8 …"). Because the Amended Complaint's allegations are not "so vague or ambiguous that [Elflein] cannot reasonably prepare a response," Fed. R. Civ. P. 12(e), Elflein's Motion for More Definite Statement (Doc. No. 98) is **DENIED**.

### C. Elflein's Motion to Stay Proceedings and Discovery (Doc. No. 99)

Elflein has also filed a Motion for Order Staying Proceedings and Discovery (Doc. No. 99) on the grounds that the Federal Bureau of Investigation (FBI) "is conducting an active criminal investigation arising from the same Springfield events, communications, persons, and alleged conduct placed at issue by" the Amended Complaint. (*Id*. at PageID 1648.) Elflein avers that he learned in May 2026 that the FBI had subpoenaed his Apple account. (Doc. No. 99-1, PageID 1666.) One of his attorneys avers that the Springfield Police Department informed him that its criminal "investigation is still open and pending. It has been taken over by the FBI." (Doc. No. 99-2, PageID 1670.) Finally, Elflein argues that the Amended Complaint "expressly alleges that [he] committed or conspired to commit numerous criminal acts under Ohio law and participated in a campaign that included bomb threats, false reports, menacing, stalking, telecommunications harassment, and incitement to violence." (Doc. No. 99, PageID 1649.)

"It is clear that nothing in the Constitution requires a civil action to be stayed in the face of a pending or impending criminal indictment." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 627 (6th Cir. 2014) (internal quotations and citation omitted). As the moving party, Elflein bears the burden of "show[ing] that there is a pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." *Ohio Environmental Council v. U.S. District Court, Southern District of Ohio*, 565 F.2d 393, 396 (6th Cir. 1977). This Court must consider several factors when ruling on Elflein's Motion:

> (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interests of the courts; and (6) the public interest.

*E.M.A. Nationwide*, 767 F.3d at 627. "The most important factor is the balance of the hardships." *Id*. at 628. In addition, the Court must address "the extent to which [Elflein's] Fifth Amendment rights are implicated." *Id*. (internal quotations and citation omitted).

At this juncture the Court cannot properly evaluate the first factor, which examines the overlap of issues in the criminal and civil proceedings, because "there has yet to be a criminal case or even an indictment filed. As a result, it is unclear which crimes [Elflein] would be charged with." *E.M.A. Nationwide*, 767 F.3d at 628. Although Elflein argues that the Amended Complaint lists numerous crimes that he ***may*** be charged with, this argument is plainly speculative. "[B]ecause there is not yet a criminal case, it cannot be said that this factor weighs in [Elflein's] favor." *Id*.

The second factor (status of the case) does not weigh in Elflein's favor because even if the FBI is investigating him, it is not inevitable that criminal charges will be filed against him. "[C]ourts generally do not stay proceedings in the absence of an indictment." *E.M.A. Nationwide*, 767 F.3d at 728; *accord Kirby Dev., LLC v. XPO Glob. Forwarding, Inc.*, No. 2:18-cv-500, 2018 U.S. Dist. LEXIS 197742, 2018 WL 6075071, at *4 (S.D. Ohio Nov. 20, 2018) ("[A] stay of civil proceedings due to a pending criminal investigation is an extraordinary remedy that is not generally granted in the absence of an indictment.") (internal quotations and citation omitted); *Chao v. Fleming*, 498 F. Supp.

2d 1034, 1037 (W.D. Mich. 2007) ("The case for a stay is strongest where the defendant has already been indicted, whereas pre-indictment requests for a stay … are usually denied.") (collecting cases).

The third factor—the private interests of Plaintiffs—weighs strongly against Elflein's request for a stay. The harms alleged in the Amended Complaint are quite serious and Plaintiffs may remain at risk of suffering similar harms. In addition to seeking damages for past conduct, Plaintiffs seek injunctive relief to prevent Defendants from committing similar acts in the future. Plaintiffs' interest in obtaining injunctive relief is strengthened by a recent report that members of the Blood Tribe are once again marching in the City of Springfield.[2] If Plaintiffs' factual allegations are true, then an indefinite delay of these civil proceedings could result in future harm to them.

The fourth factor—the private interests of Defendant Elflein, which include his Fifth Amendment rights—weighs only slightly in favor of granting his request for a stay, given the absence of criminal charges at this juncture. *See E.M.A. Nationwide*, 767 F.3d at 628 ("Because there was no indictment … the Fifth Amendment concerns expressed by Defendants are not very compelling."); *In re Firstenergy Corp. Sec. Litig.*, No. 2:20-cv-3785, 2023 WL 3728062, 2023 U.S. Dist. LEXIS 95173, at *28 (S.D. Ohio May 19, 2023) (declining to stay depositions where no criminal charges had been filed against the moving parties).

[2] *See* LeAnne Marie McPherson, *Swastika flags flown by masked marchers in Springfield*, WDTN News (Sept. 27, 2026), https://www.wdtn.com/news/springfield-spotlight/swastika-flags-flown-by-masked-men-in-springfield-march/.

The fifth factor, which addresses the Court's interest in resolving matters before it expeditiously, weighs against Elflein's request for a stay because it is uncertain when, if ever, criminal charges may be filed against him. *See E.M.A. Nationwide*, 767 F.3d at 628 ("If the court had waited for an indictment … the stay would continue to this day, causing unnecessary delay for the court.").

Finally, the sixth factor does not weigh in Elflein's favor because the public has a strong interest in a timely resolution of this matter, given Plaintiffs' allegations that Defendants' conduct has directly and adversely impacted members of the public.

Balancing these factors together and considering the hardships that Plaintiffs will suffer if this case is stayed indefinitely, the Court concludes that they weigh strongly against a stay of this litigation. Accordingly, Elflein's Motion to Stay the Proceedings and Discovery (Doc. No. 99) is **DENIED**.

**D. Elflein's Motion for Interim Protective Order (Doc. No. 100)**

Finally, Elflein filed a Motion for Interim Protective Order (Doc. No. 100 that seeks to "hold[] in abeyance his obligations to respond to Plaintiffs' August 6, 2026, interrogatories and requests for production of documents" until this Court has ruled on his Motion for More Definite Statement, Motion for Stay of Proceedings and Discovery, and a forthcoming motion he plans to file in response to Plaintiffs' operative pleading. (*Id*. at PageID 1680.) For the reasons stated below, the Motion for Interim Protective Order (Doc. No. 100) is **DENIED**.

Elflein's request to stay discovery until this Court has ruled on his Motion for More Definite Statement (Doc. No. 98) and Motion for Stay of Proceedings and

Discovery (Doc. No. 99) is moot because the Court has now ruled on those motions. The only remaining issue is Elflein's request that the Court stay discovery until Elflein has filed, the parties have briefed, and the Court has ruled on his forthcoming Rule 12(c) motion for judgment on the pleadings. (Doc. No. 100, PageID 1690 (noting that Elflein will file a "Rule 12(c) motion if the [First Amended Complaint] remains operative").

"Trial courts have broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Hahn v. Star Bank*, 190 F.3d 708, 719 (6th Cir. 1999). "Limitations on pretrial discovery are appropriate where claims may be dismissed 'based on legal determinations that could not have been altered by any further discovery.'" *Gettings v. Bldg. Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 304 (6th Cir. 2003) (citation omitted).

The question, therefore, is whether Elflein's yet-to-be-filed Rule 12(c) motion for judgment on the pleadings may succeed "based on legal determinations that could not have been altered by any further discovery." *Gettings*, 349 F.3d at 304. On this question, Elflein's Motion for Interim Protective Order provides no information. It is unclear what legal defenses or arguments Elflein will raise in a motion for judgment on the pleadings, much less whether those defenses or arguments may result in the dismissal of one or more of Plaintiffs' claims without any discovery. Accordingly, Elflein's request to stay discovery until the Court rules on his forthcoming Rule 12(c) motion is not well-taken and his Motion for Interim Protective Order (Doc. No. 100) is **DENIED**.

## V. CONCLUSION

For the reasons stated above, the Court **DENIES** Elflein's Motion to Quash Subpoenas and for Protective Order (Doc. No. 57), Elflein's Motion for More Definite Statement (Doc. No. 98), Elflein's Motion to Stay Proceedings and Discovery (Doc. No. 99), and Elflein's Motion for Interim Protective Order (Doc. No. 100). Further, the Court **VACATES** its Order Staying Deposition and Document Production of Non-Party Witness Keith Elflein (Doc. No. 71).

**IT IS SO ORDERED.**

*/s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

**DEADLINE TO FILE OBJECTIONS**

In accordance with Rule 72(a) of the Federal Rules of Civil Procedure, any party may file and serve written objections to this Order **within fourteen (14) days** after being served with a copy. A party may respond to another party's objections **within fourteen (14) days** after being served with a copy. If timely objections are filed, then the District Judge will consider them and modify or set aside any portion of the Order that is clearly erroneous or contrary to law. A party may not assign as error a defect in the Order to which no timely objection was filed. Even if objections are timely filed, this Order will remain in full force and effect unless it is stayed or overruled. *See* S.D. Ohio Civ. R. 72.3.